UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

SAMUEL PAUL

CRIMINAL ACTION

NO. 09-108-JJB-DLD

**RULING ON MOTION TO SUPPRESS**

This matter is before the Court on defendant's motion to suppress a firearm that police officers seized after searching his vehicle. (Doc. 8.) The government filed an opposition. (Doc. 10.) The Court held an evidentiary hearing on Oct. 14, 2009. The defendant and the government filed post-hearing memoranda. (Docs. 15 & 18.) After careful review of the aforementioned documents, the hearing transcript (doc. 12), and an audiovisual recording made by police, the Court GRANTS defendant's motion.

## BACKGROUND

On the night of April 8, 2009, East Baton Rouge Sheriff's officers Jason Dohm and Andy Kuber were on patrol in Bellaire. According to Dohm, the defendant's car made two turns without using a signal. Dohm pulled the defendant over in the parking lot of an apartment complex at about 10:10 p.m. Kuber then arrived to provide assistance. The officers ordered the defendant out of his vehicle and began to question him. The officers asked where the defendant's driver's license was, and he indicated it was inside his car above the driver's seat.

The officers did not obtain consent at that time to search the defendant's vehicle for his driver's license. As the United States acknowledges, the defendant "did not

specifically articulate permission for the officers to enter his vehicle."[1]  The defendant watched as Dohm walked to his car and reached inside; he did not object.  Kuber then placed the defendant in the back of Kuber's car.  According to the United States, Kuber then asked the defendant whether the officers could search his car.  The defendant allegedly consented by saying, "Tear it up. Just watch my puppy [dog]."

The officers proceeded to search the defendant's car, and Kuber discovered a .9mm Model 26 Glock wedged in the car's back seat.  The officers determined the defendant had a prior conviction for possession of cocaine.  Accordingly, they charged defendant with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

The defendant argues that the search of his vehicle was warrantless, conducted without his consent, and not based on probable cause.  He further argues that he was not given a *Miranda* warning after the gun's discovery.  He contends the gun and his subsequent statements to police should be suppressed.  The government counters that the defendant gave express verbal consent, that he was properly advised of his rights, and the evidence should not be suppressed.

## **LAW AND ANALYSIS**

The crucial question in this case is whether the defendant consented to the police search of his vehicle.  When investigating "a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects."  *Florida v. Royer*, 460 U.S. 491, 499 (1983).  Searches "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a

---

[1] Pl.'s Mem. in Opp'n (doc. 10) 1-2.

few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).  One such exception is when the defendant consents to the warrantless search.  *Royer*, 460 U.S. at 497.  If the defendant did not consent, the police search of his vehicle is per se unreasonable under the Fourth Amendment and the gun must be suppressed. However, if the defendant gave consent, the exception to the above-stated general rule applies, and the fruits of the search are admissible.

The defendant raises two principal arguments to dispute the government's allegation that he gave consent.  First, he contends that an audiovisual recording made by a device in Dohm's car—a "dash cam"—refutes Kuber's testimony concerning the purported grant of consent.  Second, he contends the two officers' testimony conflicts on the issue of how they communicated the purported consent to each other.  The Court addresses these arguments in turn.

    I.    <u>The Audiovisual Recording Is Inconclusive</u>

The "dash cam" in Dohm's car recorded video and audio of the arrest.  The video shows that Dohm positioned the defendant on the hood of Dohm's vehicle and asked for his license.  The defendant gestured and responded, indicating the license was inside the car tucked in the visor over the driver's seat.  Dohm left the camera frame, and it is undisputed that he began to look for the license in the defendant's vehicle. The "dash cam" did not record the defendant later giving verbal consent to Kuber to search his car.  According to the police, this omission occurred because the exchange took place in the back seat of Kuber's vehicle, out of range of the device's microphone. Because the audio was recorded through a microphone affixed to Dohm's vest, the only

3

conversations recorded were those made in his presence or within "earshot" of that microphone.

Defendant argues that the defendant's purported consent, if granted, would have been recorded. However, Dohm's location in relationship to Kuber when the defendant allegedly granted consent cannot be determined from the video. The purported grant of consent could have been out of "earshot" of the microphone. Therefore, the audiovisual recording is inconclusive on this point. The only other evidence concerning consent is the testimony of the two officers.

II.     The Officers' Testimony About The Defendant's Consent Conflicts

Kuber is the only person who claims to have received consent from the defendant. Dohm testified that he neither witnessed nor overheard the exchange in which the defendant gave consent. Therefore, Kuber's credibility drives the Court's determination of whether consent was granted. That credibility is crippled by inconsistent statements the officers made during the Oct. 14, 2009, hearing.

The officers' testimony conflicts in one significant respect. According to Kuber, he communicated to Dohm—either verbally or by making a sign—that he had obtained consent. Dohm directly contradicted that assertion, saying Kuber neither spoke nor gestured to him. Instead, Dohm said he *assumed* that the defendant gave Kuber consent based on the fact that Kuber began to search the vehicle. The discrepancy in testimony is illustrated by several exchanges during the evidentiary hearing.[2]

---

[2] **Kuber: I advised Officer Dohm that Mr. Paul had granted verbal consent to look inside his vehicle.**
Q: And how did you inform Officer Dohm of this?
**Kuber**: I don't recall exactly. A lot of times if we're a distance away, we'll give a thumbs up. Tr. (Doc. 12) 16:12-16 (emphasis added).

4

Other circumstantial factors[3] also weigh against consent. As the audiovisual recording reveals, the defendant was not in custody voluntarily. The government contends the police did not use coercive procedures to obtain consent. However, Dohm used "rough language" to subdue him. After the defendant had spread his arms and legs and leaned over Dohm's car, Dohm patted down his body. When the defendant complained, Dohm patted the back of the defendant's head three times and told him to calm down. A few moments later, Dohm raised his hand and told the defendant to "quit [expletive] yelling at me. You [expletive] yell at me one more time and I'm going to have a problem." The fact that the defendant subsequently did not protest when Dohm

---

Kuber: Once he gave verbal consent, **I relayed that information to Officer Dohm**. And Officer Dohm and myself then searched the interior of the vehicle. Tr. (Doc. 12) 19:10-12 (emphasis added).

Kuber: I don't recall if we—a lot of times we use hand signals, a lot of times we'll communicate. I don't necessarily recall on this particular night if we gave a thumbs up, a hand signal, or if I told him, hey, we got permission, we're good, go for it, whatever. Tr. (Doc. 12) 42:1-5.

Dohm: My understanding from working with him back here for two years and previously in the district was that if he's searching a vehicle, he has obtained verbal consent.
Q: **Did he tell you this?**
**Dohm: No, sir.**
Q: **Did he motion, or any way let you know this, or that you saw?**
**Dohm: No, sir.**
Q: OK, and why did you assume that?
Dohm: Just from working with him, I know that he would not jeopardize his career, or my career, just to search a vehicle. If we wouldn't have—if he wouldn't have obtained verbal consent, then we would have just—we wouldn't have been able to do anything. Tr. (Doc. 12) 61-62:20-25,1-5 (emphasis added).

Q: And if I understood your testimony correctly, he didn't signal to you, he didn't indicate to you, he didn't tell you, or communicate to you in any way that Mr. Paul had consented to a search of the vehicle; is that correct?
Dohm: Not verbally with hand signals, but when he entered the vehicle—I mean, I worked with him for—since August 2007 every day, and before that, in the district. When he entered the vehicle—you know, it's kind of like we know what each other is going to do. You can tell. You know. That's something you've got to have, and you know, and when he entered the vehicle, and he began looking, it clicks in my head, hey, this guy gave verbal consent. I don't need to say, "hey, did we get verbal consent?"
Q: You assumed it?
Dohm: Correct. Tr. (Doc. 12) 69:10-24.

[3] *See United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005) (holding that "voluntariness of consent is a question of fact to be determined from the totality of the circumstances," including factors such as the voluntariness of the defendant's custodial status and the presence of coercive police procedures).

5

began to retrieve the defendant's license does not demonstrate he impliedly consented to a search at that point.  Moreover, when the defendant's phone rang, Dohm reached into the defendant's pants pocket, removed the phone and opened it, shining his flashlight on the display.  His investigative purpose is not clear, but his disregard for the defendant's consent at that point is plain.

The recording clearly shows that Dohm began to look for the defendant's license without asking permission, and consent may not be inferred from the defendant's failure to object.  Dohm continued to search for the license for at least 38 seconds before Kuber joined him; this is evident from his two statements: "I don't see no driver's license" at approximately 10:11:47 and "ain't no I.D. up here" at 10:12:25.  After that point, the two officers began to search the car together.  This time lag belies the assertion that the police began their search after the alleged consent was granted, because it indicates the officers conducted one, continuous search that began when Dohm sought to retrieve the license.  The recording reveals no movement or dialogue between the two sequences that separates them into two, discrete searches.

Ultimately, the discrepancy in the two officers' testimony militates against consent.  If the two officers had communicated affirmatively—in any manner—that consent had been granted, their exchange would support Kuber's assertion.  In light of their contradiction, however, his assertion is simply not credible.  As Dohm acknowledged, he proceeded to search the defendant's vehicle because he *assumed* consent had been granted.  But the narrow exception to the general rule that warrantless searches are unreasonable—voluntary consent—requires more than an assumption.  Such a search runs afoul of the Fourth Amendment.

## **CONCLUSION**

Because the officers' testimony conflicts, the Court finds consent was not granted. Because the officers searched the defendant's vehicle without his consent, any arguments regarding his *Miranda* warnings are moot. Accordingly, the defendant's motion to suppress (doc. 8) the firearm is hereby GRANTED.

Signed in Baton Rouge, Louisiana, this 29th day of January, 2010.

———————————————————
JUDGE JAMES J. BRADY
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA